**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| GRANITE STATE INSURANCE CO. and NEW HAMPSHIRE INSURANCE CO., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN BUILDING MATERIALS, INC., KB HOME, INC., and KB HOME TAMPA, LLC, | ) Case No. 8:10-cv-01542 ) ) ) |
| Defendants. | ) |

**PLAINTIFFS GRANITE STATE INSURANCE COMPANY'S AND NEW HAMPSHIRE INSURANCE COMPANY'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LEGAL AUTHORITY**

Plaintiffs Granite State Insurance Company ("Granite State") and New Hampshire Insurance Company ("NHIC") hereby move this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for entry of summary judgment against Defendants American Building Materials, Inc. ("ABM") as well as KB Home, Inc. and KB Home Tampa, LLC (collectively "KB Home").  In support of this motion, Plaintiffs state as follows:

## I.      SUMMARY OF ARGUMENT

Certain lawsuits and pre-suit claims have been brought against Defendants ABM and KB Home alleging that ABM supplied defective drywall imported from China (hereinafter, "Chinese drywall"), and that KB Home constructed homes using this drywall.  The alleged defect in this Chinese drywall is that it releases noxious sulfide gases that cause damage to real and personal property, as well as physical injuries to persons.

Granite State and NHIC each issued three policies of liability insurance to ABM, none of which provide coverage for claims and suits arising out of Chinese drywall.

1

Specifically, the policies issued by Granite State and NHIC exclude coverage for, among other things, "bodily injury" or "property damage" caused by or arising out of the "discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"   Because the Chinese drywall is alleged to have released pollutants in the form of irritating and contaminating gases, coverage for these lawsuits and pre-suit claims is precluded.

## II.   UNDISPUTED MATERIAL FACTS

### A.  The Drywall Claims

Granite State and NHIC are aware of four lawsuits involving Defendants that arise out of Chinese drywall (the "Underlying Lawsuits").   The Underlying Lawsuits seek to recover costs associated with the removal and replacement of the drywall itself, adjoining components such as electrical wiring and interior finishes, damage to personal property, diminution in real property value, damages for bodily injuries, and the establishment of a medical monitoring program.   The allegations of the four Underlying Lawsuits may be summarized as follows:

### 1.   *KB Home Tampa, LLC v. American Building Materials, Inc.*

Granite State and NHIC received notice of a lawsuit captioned *KB Home Tampa, LLC v. American Building Materials, Inc.*, No. 10-001432 (Fla. Cir. Ct.) (Complaint at Ex. B). The causes of action asserted in *KB Home* against ABM are based entirely on allegations that certain homes constructed by KB Home contain Chinese drywall supplied by ABM. According to *KB Home*, this drywall was "emitting gases that are negatively interacting with other elements where installed, causing damage to the Subject Homes and other property,

including, but not limited to, HVAC coils, certain electrical and plumbing components, and other affected materials." (Complaint at Ex. B at ¶¶ 9, 12).

2. *Wiltz v. Beijing New Bldg. Materials Public Ltd. Co., et al.*

Granite State and NHIC received notice of a lawsuit captioned *Wiltz v. Beijing New Building Materials Public Ltd. Co., et al.*, No. 10-361 (E.D. La.) (Complaint at Ex. C), which was filed in connection with the multi-district litigation captioned *In re Chinese-Manufactured Drywall Products Liability Litigation*, No. 2:09-md-02047 (E.D. La.) (the "Drywall MDL").  The causes of action asserted against KB Home and ABM in *Wiltz* are based entirely on allegations that Chinese drywall in certain homes "break[s] down and release[s] sulfides and other noxious gases that are then emitted (or 'off-gassed') from the drywall." (Complaint at Ex. C at ¶ 779).  *Wiltz* alleges that these gases are "proven hazardous, dangerous or toxic substances" that cause damage to property and injuries to persons, (Complaint at Ex. C at ¶ 943), and that "structures, personal property, and bodies have been exposed to Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from Defendants' defective drywall." (Complaint at Ex. C at ¶ 782).  *Wiltz* further alleges that these "sulfides and other noxious gases" caused "corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property)," as well as "personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs and/or neurological harm." (Complaint at Ex. C at ¶¶ 780-81).

### 3.  *Payton v. Knauf GIPS KG*

Granite State and NHIC received notice of a lawsuit captioned *Payton v. Knauf GIPS KG*, No. 09-7628 (E.D. La.) (attached hereto as Ex. A) that was also filed in the Drywall MDL.  The causes of action asserted in *Payton* against "KB Home Florida LLC," "KB Home Fort Myers, LLC," and "KB Home of Orlando, LLC" are based entirely on allegations that Chinese drywall in various homes "break[s] down and release[s] sulfides and other noxious gases that are then emitted (or 'off-gassed') from the drywall."  (Ex. A at ¶¶ 2611-2613).  The allegations in *Payton* regarding the nature and effect of this drywall are verbatim to the allegations in *Wiltz*.

### 4.  *Gross v. Knauf GIPS KG*

Granite State and NHIC received notice of a lawsuit captioned *Benes v. Knauf GIPS KG, et. al.,* No. 09-6690 (E.D. La.) (attached hereto as Ex. B), which was filed as a complaint in intervention in an omnibus class action complaint pending in the Drywall MDL captioned *Gross v. Knauf GIPS KG*, No. 09-6690 (E.D. La.).  The causes of action asserted in *Gross* are based entirely on the installation of Chinese drywall that allegedly "break[s] down and release[s] sulfides and other noxious gases that are then emitted (or 'off-gassed') from the drywall."  (Ex. B at ¶ 1424).  The allegations in *Gross* regarding the nature and effect of this drywall are verbatim to the allegations in *Payton* and *Wiltz*.

### 5.  The Pre-Suit Claims

In addition to the Underlying Lawsuits, KB Home and ABM have provided notice to Granite State and NHIC of potential claims arising out of allegedly defective Chinese drywall (the "Pre-Suit Claims") (attached hereto as Ex. C).  The Pre-Suit Claims indicate that

certain homes built by KB Home are "being affected by unusual releases of sulfide gases from the wallboard supplied by ABM." *Id.* The Pre-Suit Claims state that KB Home was an insured under ABM's insurance policies, and that KB Home is requesting that ABM and its insurers pay for the cost of removing and replacing the drywall, as well as defense and indemnification relating to any and all drywall-related claims. *Id.*

## B. The Granite State and NHIC Policies

Granite State issued the following three Commercial General Liability Policies to ABM: (1) Policy Number 02-LX-00927343-0/000, effective June 15, 2007 to June 15, 2008 (Complaint at Ex. D); (2) Policy Number 02-LX-00927343-1/000, effective June 15, 2008 to June 15, 2009 (Complaint at Ex. E); and (3) Policy Number 02-LX-00927343-2/000, effective June 15, 2009 to June 15, 2010 (Complaint at Ex. F) (collectively, the "Granite State Policies"). Among other exceptions from coverage, the Granite State Policies are each subject to a Total Pollution Exclusion that bars coverage for "bodily injury" or "property damage" that would not have occurred in whole or in part but for "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Complaint at Ex. D at p. 42; Complaint at Ex. E at p. 47; Complaint at Ex. F at p. 48). The Granite State Policies define "pollutants" in relevant part as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Complaint at Ex. D at p. 28; Complaint at Ex. E at p. 33; Complaint at Ex. F at p. 34).

NHIC issued the following three Umbrella Policies to ABM: (1) Policy Number 01-UD-000338726-0/000, effective June 15, 2007 to June 15, 2008 (Complaint at Ex. G); (2)

Policy Number 01-UD-000338726-1/000, effective June 15, 2008 to June 15, 2009 (Complaint at Ex. H); and (3) Policy Number 01-UD-000338726-2/000, effective June 15, 2009 to June 15, 2010 (Complaint at Ex. I) (collectively the "NHIC Policies").  Among other exclusions from coverage, the NHIC Policies are each subject to a Total Pollution Exclusion that bars coverage for "bodily injury" or "property damage" "arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." (Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27).  The NHIC Policies define "pollutants" in relevant part as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material."  (Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27).

## III.   MEMORANDUM OF LEGAL AUTHORITY

### A.  LEGAL STANDARDS

#### 1.  Summary Judgment Standard

A motion for summary judgment should be granted when the evidence presented by the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.  *Valadez v. Graham*, 474 F. Supp. 149, 154-55 (M.D. Fla. 1979) (citations omitted).  A court should grant summary judgment under these circumstances because there is no genuine issue requiring a judge or jury to resolve the parties' differing versions of truth at trial.  *Id*. at 155.

**2.  Choice of Law:  Florida Substantive Law Controls**

In diversity actions, a federal district court resolving a conflict of law issue applies the substantive law of the forum in which it sits.  *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997).  In contract cases, while courts applying Florida law have relied on the doctrine of *lex loci contractus* (in which a court follows the law of the state where the contract was made or to have been performed), other courts applying Florida law in cases involving insurance contracts have applied the "most significant relationship" test under the Restatement (Second) of Conflict of Laws.  *Id.* at 1511; *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990); *Great Am. Ins. Co. v. Sadiki,* 170 Fed. Appx. 632 (11th Cir. 2006).

Because this dispute's extensive connection with the state of Florida, both approaches would require the application of Florida law.  Specifically: (1) the Granite State Policies and NHIC Policies (collectively, the "Policies") were issued to ABM, a Florida corporation headquartered in Pasco County, Florida; (2) the Policies were delivered to ABM in Florida; (3) the Policies were produced by Lassiter-Ware Insurance, located in Tampa, Florida; (4) ABM is in the business of selling drywall and building products throughout the state of Florida; (5) the Chinese drywall at issue in the Drywall Claims was purchased in Florida; (6) all of the identified properties at issue in the Drywall Claims are located in Florida; and (7) the health-related claims in the Drywall Claims arise out of the alleged exposure to drywall in properties within the state of Florida.  Under these facts, the law of Florida governs all issues of substantive law.

**3.   Florida Law Regarding the Interpretation of Insurance Policies**

The construction of an insurance policy is a question of law. *Fla. Farm Bureau Ins. Co. v. Birge,* 659 So. 2d 310, 312 (Fla. Dist. Ct. App. 1994). A court may not rewrite a policy or add meaning to create ambiguity where there is none. *State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So. 2d 1245, 1248 (Fla. 1986). A policy is not deemed ambiguous simply because it requires interpretation, nor does failing to define a policy term create ambiguity. *See Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.,* 757 F.2d 1172 (11th Cir. 1985). Rather, there must be "a genuine inconsistency, uncertainty, or ambiguity in meaning" that remains even after application of the ordinary rules of construction. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 942 (Fla. 1979). When the language of an insurance policy is clear and unambiguous, a court must interpret it according to its plain meaning, giving effect to the policy as it was written. *E. Fla. Hauling, Inc. v. Lexington Ins. Co.*, 913 So. 2d 673, 676 (Fla. Dist. Ct. App. 2005).

**4.   The Duty to Defend and Indemnify Under Florida Law**

When determining the duty to defend under Florida law, courts must look only at the allegations in the complaint and the terms of the policy. *Phila. Indem. Ins. Co. v. Yachtsman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1322 (S.D. Fla. 2009). There is no duty to defend if an exclusion precludes coverage for the underlying allegations. *Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345, 1349 (M.D. Fla. 2004). If there is no duty to defend, it necessarily follows that there can be no duty to indemnify. *Council v. Paradigm Ins. Co.*, 133 F. Supp. 2d 1339, 1341 (M.D. Fla. 2001).

## B. ARGUMENT

The Total Pollution Exclusions in the Policies, when read together with the allegations in the Underlying Lawsuits and the Pre-Suit Claims (collectively, the "Drywall Claims"), indicate that Granite State and NHIC have no duty to defend or indemnify ABM or KB Home.

### 1. The Policies' Total Pollution Exclusions Are Unambiguous

Florida courts have universally recognized that the operative language in the Total Pollution Exclusions is clear and unambiguous.  In *Deni Associates of Florida, Inc. v. State Farm Fire & Casualty Insurance Co.*, the Florida Supreme Court held that a pollution exclusion with the same relevant language as that in the Policies[1] contained no ambiguity. 711 So. 2d 1135, 1137-38 (Fla. 1998).  *Deni* concerned two unrelated underlying cases; the first involved claims arising from personal injuries allegedly caused by the inhalation of ammonia fumes, while the second involved claims arising from personal injuries allegedly caused by skin contact with an insecticide.  *Id*. at 1136.  The court in *Deni* held that the pollution exclusion at issue was not ambiguous, that it precluded coverage for the underlying cases, and that "[a] substantial majority" of courts deciding the issue had reached the same conclusion.  *Id*. at 1138-41.

Most recently, the United States District Court for the Southern District of Florida followed *Deni* when it held that a practically identical total pollution exclusion was unambiguous and that it barred coverage for Chinese drywall claims.  *General Fid. Ins. Co.*

---

[1] The operative language in *Deni* excluded personal injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants," with the term "pollutants" defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalines, chemicals and waste."  *Id*. at 1138.

*v. Foster*, No. 9:09-cv-80743 (S.D. Fla. Mar. 24, 2011) (attached hereto as Ex. D at p. 10). Specifically, the policies at issue in *General Fidelity* contained exclusions barring coverage for "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Ex. D at p. 4). These policies defined "pollutants" as "any solid, liquid, gaseous, thermal, acoustic, electric, magnetic or electromagnetic irritant or contaminant," including but not limited to "smoke, vapor, soot, dusts, fumes." (Ex. D at p. 5). Based on this language, the court in *General Fidelity* specifically stated that "[t]here is nothing ambiguous about the [pollution] exclusion here," and granted summary judgment on grounds that the insurer had no duty to defend or indemnify its insured for claims arising out of defective Chinese drywall. (Ex. D at p. 10). *General Fidelity* was consistent with the conclusions reached by every federal court applying Florida law since *Deni*, which found similar or identical pollution exclusions unambiguous.

Even prior to the Florida Supreme Court's pronouncement in *Deni*, this Court reached the same conclusion in the case of *West American Insurance Co. v. Band & Desenberg*, 925 F. Supp. 758 (M.D. Fla. 1996), *aff'd*, 138 F.3d 1428 (11th Cir. 1998). Like *Deni*, the policy at issue in *Band & Desenberg* contained a pollution exclusion practically identical to those in the Policies.[2] Also similar to the instant case, the claimants against the insured in *Band & Desenberg* alleged that a variety of "contaminants in [a] building's air caused them to suffer

---

[2]   The operative language excluded "bodily injury" or "property damage" "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants," with "pollutants" defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 759-60.

from a series of symptoms." *Id.* at 760.  Holding that the pollution exclusion barred coverage

for the underlying "indoor air pollution" claim, this Court found as follows:

> [T]here is no ambiguity in the language of the pollution exclusion…. Under
> Florida law, which controls in this case, this Court is barred from rewriting the
> terms or going beyond the language to examine the intent of the insurer or the
> expectations of the insured when the language of the policy is clear and
> unambiguous.  Under the clear language of the policy, there is no coverage for
> bodily injury due to a release or dispersal of contaminants … into the air
> supply of the building….

*Id.* at 762.  This Court went on to conclude that the insurer had no duty to defend the indoor

air pollution claims because there was no possibility of coverage.  *Id.*

 In sum, whether dealing with claims alleging bodily injury, *see e.g.*, *Deni*, 711 So. 2d

1135, property damage, *see, e.g.*, *James River*, 540 F.3d 1270, or a combination of both

bodily injury and property damage, *see, e.g.*, *Cont'l Cas. Co. v. City of Jacksonville*, 654 F.

Supp. 2d 1338 (M.D. Fla. 2009), and whether dealing with CGL policies, *see, e.g.*, *Auto

Owners*, 231 F.3d 1298, or other types of policies, *see, e.g.*, *James River*, 540 F.3d 1270

(professional liability policy), courts applying Florida law hold that the language contained in

the Policies' Total Pollution Exclusions is clear and unambiguous, and that it should be

applied as written.  As in *General Fidelity*, this Court should apply the Total Pollution

Exclusions as written to the Drywall Claims, and without any reference to extrinsic evidence.

### 2. The Drywall Claims Allege a Release, Dispersal, or Escape of Pollutants

The Total Pollution Exclusions in the Granite State Policies preclude coverage for

injury or damages that would not have occurred but for "the actual, alleged or threatened

discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

(Complaint at Ex. D at p. 42; Complaint at Ex. E at p. 47; Complaint at Ex. F at p. 48).

Similarly, the NHIC Policies are each subject to a Total Pollution Exclusion that bars coverage for injury or damages "arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." (Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27). The Policies define "pollutants" in relevant part as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Complaint at Ex. D at p. 42; Complaint at Ex. E at p. 47; Complaint at Ex. F at p. 48; Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27). As explained below, the allegedly harmful substances emitted from Chinese drywall constitute "irritants" and "contaminants," thereby falling within the scope of these Total Pollution Exclusions.

### a. The Terms "Irritant," and "Contaminant" Are Not Limited to Environmental or Industrial Pollution

Florida courts interpret the terms "irritant" and "contaminant" as used in the Total Pollution Exclusions according to their plain and ordinary meaning. *Deni*, 711 So. 2d at 1140. In interpreting the term "pollutant," the *Deni* court expressly declined to construe the term in accordance with the "reasonable expectations" of the insured.[3] *Id.* Instead, the court relied on definitions in Webster's Dictionary, terms used in state and federal statutory guidelines, and the conclusions reached by other courts. *Id.* at 1140-41. The court stated that "an irritant is a substance that produces a particular effect," namely, "irritation" or

---

[3] The court noted that considering the insured's expectations in determining the scope of the term "pollutant" would "be to rewrite the contract and the basis upon which the premiums are charged" simply because it is not in accord with the insured's expectations of coverage. *Id.* at 1140.

"contamination."[4]   *Id*.   It further recognized that the substances at issue were generally understood to be "extremely pungent in smell," "hazardous," having "adverse effects to human health," and that they were capable of causing injuries.   *Id*. at 1140-41.   The court further noted that these substances were recognized as "pollutants" according to government regulations.   *Id*.   Therefore, the substances were deemed "pollutants," such that any injuries stemming from these substances were precluded from coverage under the policies' pollution exclusions.   *Id*.

Similarly, in *Philadelphia Indemnity Insurance Co. v. Yachtsman's Inn Condo Association, Inc.*, the United States District Court for the Southern District of Florida followed *Deni* in interpreting a practically identical pollution exclusion.[5]   595 F. Supp. 2d 1319 (S.D. Fla. 2009).   The injuries at issue in *Philadelphia Indemnity* were allegedly caused by the underlying plaintiff's exposure to raw sewage and battery acid while on the insured's premises.   *Id*.   The court stated that in determining whether a substance is an irritant or contaminant, it should also "look to see if the disputed substance is alleged to have had a particular effect commonly thought of as 'irritation' or 'contamination.'"   *Id*. at 1324 (emphasis in original).   In making this inquiry, the court examined the underlying complaint, which alleged that these substances posed a "dangerous health risk," constituted a "hazardous

---

[4] As noted in *Deni* and subsequent cases, courts applying pollution exclusions sometimes find it useful to look at the "particular effect" a substance is alleged to have had when determining whether it constitutes an irritant or contaminant.  If a substance is alleged to have had the "particular effect" of irritation or contamination, it constitutes a "pollutant."  *See, e.g., Am. States Inc. v. Nethery*, 79 F.3d 473, 476 (5th Cir. 1996) (applying "particular effect" test to alleged damages arising out of paint and glue products).

[5] The court interpreted the following language: "This insurance does not apply to … 'Bodily injury' … arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"  *Phila. Indem.*, 595 F. Supp. 2d at 1321.  The term "pollutants" was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  *Id*.

condition," and caused "severe dermatological injuries." *Id*.  The court concluded "[s]uch allegations fit the ordinary meaning of an 'irritant or contaminant.'"  *Id*.  Following the precedent articulated in *Deni*, the court applied the exclusion and refused to limit its application to "environmental or industrial pollution." *Id*. at 1325.

Also, in *Nova Casualty v. Waserstein*, the United States District Court for the Southern District of Florida interpreted a pollution exclusion practically identical to the ones at issue in the instant case.[6]  424 F. Supp. 2d 1325, 1340 (S.D. Fla. 2006).  The underlying litigation in *Nova Casualty* alleged that plaintiffs were physically injured by exposure to harmful and hazardous chemicals, particles, and microbes while working in the insured's building.  *Id*. at 1329.  The court concluded that the underlying claims were "indisputably excluded" by the policy's pollution exclusion.  *Id*. at 1332.  In reaching this conclusion, the court not only relied on the dictionary definitions of the terms in the exclusion but, as in *Philadelphia Indemnity*, also focused on whether the substances at issue had "a particular effect commonly thought of as "irritation" or "contamination."  *Id*. at 1334 (emphasis in original).  In addressing this issue, the court noted not only that the substances at issue "fit the ordinary definition of a contaminant," but that these substances were also alleged to have had a "contaminating" effect such that they "traveled from surfaces in the building, through the air, and came in contact with the plaintiffs," causing injury.  *Id*.  The court therefore applied the pollution exclusion without exception.

---

[6]  The court interpreted an exclusion precluding coverage for "'bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of 'pollutants' at any time."  *Nova Cas.*, 424 F. Supp. 2d at 1329.  The term "pollutants" was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."  *Id*.

Most notably, these principles were applied in the specific context of Chinese drywall in *General Fidelity*, *supra*. In *General Fidelity*, the United States District Court for the Southern District of Florida followed *Deni*, concluding that Chinese drywall claims at issue arose out of a "pollutant." The *General Fidelity* court considered underlying allegations common to all Chinese drywall cases – including those at issue in the instant case – and held that Chinese drywall caused particular effects such as "damage and corrosion," including the "pitting and/or tarnishing" of metals, the "malodorous smell" of "rotten eggs," and "respiratory problems, sinus problems, eye problems, and nosebleeds." The court in *General Fidelity* concluded that the effects of defective Chinese drywall unambiguously constituted "irritation" and "contamination" caused by pollutants. *Id.* at p. 8-9 ("The gypsum here is defective and its components obviously cause irritations and contamination.").

### b. Sulfide Gases And Other Substances Released From Chinese Drywall Constitute "Pollutants"

The Drywall Claims plainly allege "bodily injury" and "property damage" caused by or arising out of "pollutants." Specifically, the Policies define "pollutants" in relevant part as a "gaseous … irritant or contaminant." (Complaint at Ex. D at p. 28; Complaint at Ex. E at p. 33; Complaint at Ex. F at p. 34; Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27). The *General Fidelity* court relied on the following dictionary definition to determine that Chinese drywall is alleged to constitute an "irritant" and "contaminant":

> Webster's Dictionary defines "irritant" as "something that irritates or excites." "Irritate" is defined as "roughened, reddened, or inflamed." "Contaminant" is defined as "something that contaminates" and "contaminate" means "to soil, stain, corrupt, or infect by contact or association" or "make inferior or impure by mixture."

*Gen. Fid.*, (Ex. D at 8) (citations omitted).   Additionally, the word "irritant" is generally defined as "causing irritation; *specifically*: tending to produce physical irritation." *Merriam-Webster Dictionary,* http://www.merriam-webster.com (Nov. 18, 2010).   Furthermore, Merriam-Webster's Medical Dictionary specifically uses the example "contaminated by *sulfur dioxide*" – a harmful sulfide gas similar to those alleged in the Drywall Claims – to illustrate the meaning of the term "contaminate." *Merriam-Webster's Medical Dictionary*, http://dictionary.reference.com (November 18, 2010) (emphasis added).

In the instant case, as in *General Fidelity*, the sulfide and other gases at issue in the Drywall Claims are clearly "gaseous" in nature.  Furthermore, the Drywall Claims allege that the sulfide and other gases emitted by the defective drywall caused irritation, specifically that they tended to produce physical irritation.   In addition to being alleged to have been "irritants," these gases also constitute "contaminants" because they are alleged to have caused harm to, corrupted, made inferior, and made unfit for use the affected real and personal property at issue.   Specifically, the gases emitted from the defective drywall are alleged to have caused physical irritation in the form of "eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm." (Complaint at Ex. C at ¶ 781; Ex. A at ¶ 2613; Ex. B at ¶ 1426).  The Drywall Claims further allege that the "sulfides and other noxious gases" at issue "are proven hazardous, dangerous or toxic substances," and that exposure to these gases "may lead to serious health problems, diseases and medical conditions."  (Complaint at Ex. C at ¶¶ 943, 945; Ex. A at ¶¶ 2764, 2766; Ex. B at ¶¶ 1584, 1586).  The claimants in the Drywall Claims allege that, as a result of the effects of the gases released by the defective drywall, they have "developed a

significantly increased risk of contracting a serious latent disease." (Complaint at Ex. C at ¶ 947; Ex. A at ¶ 2768; Ex. B at ¶ 1588). The Drywall Claims further allege that the gases released by the defective drywall "negatively interact[ed] with other elements where installed, causing damage to the Subject Homes and other property, including, but not limited to, HVAC coils, certain electrical and plumbing components, and other affected materials." (Complaint at Ex. B at ¶ 12). Furthermore, contact with the "[s]ulfides and other noxious gases" emitted by the defective drywall allegedly caused "corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property)." (Complaint at Ex. C at ¶ 780; Ex. A at ¶ 2612; Ex. B at ¶ 1425).

In sum, the damages alleged in the Drywall Claims were caused by "irritants" and "contaminants" as those terms are commonly used and interpreted. Therefore, this Court should find that the Drywall Claims are excluded from coverage.

### c. Judicial Opinions Hold That The Defective Drywall Emits "Pollutants"

Furthermore, courts across the United States have held that sulfide gases – the alleged primary injury-causing agent at issue in the Drywall Claims – are "pollutants" within the meaning of practically identical pollution exclusions. In addition to the *General Fidelity* holding, the same conclusion was also reached by the United States District Court for the Eastern District of Virginia in *Travco Ins. Co. v. Larry Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010), which applied a nearly identical pollution exclusion to preclude coverage for claims

arising out of sulfide and other gases released from defective Chinese drywall.[7]   Although the insured in *Travco* argued that the pollution exclusion did not apply because the Chinese drywall itself was not a contaminant or a pollutant, the court disagreed, stating that "[w]hile counsel gets points for creativity, the Court rejects this argument.   Although the Drywall itself may not be a pollutant, the gases it releases are.   There is no dispute that the Chinese Drywall has released reduced sulfur gases into the … [r]esidence" in question.   *Id.* Following the analysis in *Deni* and similar cases, the court in *Travco* noted that "[b]oth state and federal authorities recognize reduced sulfur gases as pollutants," and that the "broad definition of pollutants in the Policy includes any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and that "[u]nder any reasonable definition of these terms, the gases released into the … [r]esidence [at issue] qualify as irritants and contaminants." *Id.* at 718.

Other courts across the United States have recognized that sulfide gases are "pollutants" within the meaning of practically identical pollution exclusions. *See, e.g.*, *Rockhill Ins. Co. v. Coyote Land Co., Inc.*, No. 3:09-cv-556 (N.D. Fla. Feb. 4, 2011) (holding that "[t]he undisputed facts establish that hydrogen sulfide is a hazardous air pollutant" and that "it is a gaseous contaminant and pollutant within the meaning of the [total pollution exclusion]") (attached as Exhibit E); *SUA Ins. Co. v. Tikal Constr. Co.*, No. 2:10-cv-406, (M.D. Fla. Mar. 23, 2011) (holding that the total pollution exclusion bars coverage for claims alleged in the *Payton*

---

[7]   The pollution exclusion at issue in *Travco* precluded coverage for loss caused by "discharge, dispersal, seepage, migration, release or escape of pollutants." *Id.* at 715.   "Pollutants" was defined as "any thermal, solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.*

Complaint "to the extent [the insured's] liability arises out of the release or sulfides and other noxious gases") (attached as Exhibit F).

Also, in *United National Insurance Co. v. Motiva Enterprises, L.L.C.*, the United States Court of Appeals for the Fifth Circuit held that sulfide gases were a "pollutant." 525 F.3d 400 (5th Cir. 2008); s*ee also Essex Ins. Co. v. Dixon*, 2010 WL 3746295, *5 (S.D. Fla. Sept. 21, 2010) (finding that injuries caused by construction dust, noise and damage were "caused by the discharge, transportation, contamination and migration of toxic chemicals that were 'pollutants,'" which included hydrogen sulfide). Similarly, in *Alcolac Inc. v. California Union Insurance Co.*, 716 F. Supp. 1546 (D. Md. 1989), sulfide gases were one of the injury-causing toxic compounds at issue in the underlying litigation. *See Elam v. Alcolac, Inc.*, 765 S.W.2d 42 (Mo. Ct. App. 1988) (underlying case). In that case, the United States District Court for the District of Maryland held that sulfide gases were a pollutant within the meaning of an absolute pollution exclusion substantially similar to the Policies' Total Pollution Exclusions. *See Alcolac*, 716 F. Supp. 1546.

Based on the foregoing, this Court should deem the sulfide gases at issue in the Drywall Claims to be "pollutants" for purposes of applying the Total Pollution Exclusions, such that the Drywall Claims are excluded under the Policies.

### d. Government Agencies and Statutory Guidelines Designate Sulfide Gases as "Pollutants"

Even looking beyond the terms as used in the Policies and the conclusions reached by other courts, it is notable that government agencies regard sulfur and sulfide gases as irritants, contaminants, and pollutants. For example, the United States Environmental Protection Agency ("EPA") categorizes sulfur dioxide as one of six "major pollutants" listed

as a "criteria pollutant" under the Clean Air Act.[8]  Furthermore, under the Clean Air Act, the

EPA was required to "develop and implement a control strategy for emissions of hydrogen

sulfide to protect human health and the environment" from its negative effects.  42 U.S.C. §

7412(n)(5).  Similarly, the Federal Agency for Toxic Substances and Disease Registry

("ATSDR") defines sulfur dioxide as a "hazardous substance" that is life threatening at high

levels of exposure and dangerous at lower levels over a longer term of exposure,[9] and has

stated that it "may cause *irritation* to the eyes, nose, or throat."[10]  Hydrogen sulfide and

carbon disulfide are also both listed as part of the Comprehensive Environmental Response,

Compensation and Liability Act's ("CERCLA") Priority List of Hazardous Substances.[11]

Additionally, the United States Occupational Safety and Health Administration ("OSHA")

identifies hydrogen sulfide as "both an *irritant* and a chemical asphyxiant," warning that

"[l]ow concentrations [of hydrogen sulfide] *irritate* the eyes, nose, throat and respiratory

system."[12]  OSHA further categorizes sulfur dioxide, carbon disulfide, and hydrogen sulfide

as "air *contaminants*."[13]  These sources are further evidence that the substances allegedly

emitted from Chinese drywall should constitute "pollutants."

---

[8]     EPA, Sulfur Dioxide Basic Information (2010), *available at* http://www.epa.gov/air/sulfurdioxide/basic.html (attached hereto as Ex. G).
[9]   ATSDR, Sulfur Dioxide Fact Sheet, (1999), *available at* http://www.atsdr.cdc.gov/tfacts116.pdf (attached hereto as Ex. H).
[10]     ATSDR, Hydrogen Sulfide Fact Sheet, (2006), *available at* http://www.atsdr.cdc.gov/tfacts114.pdf) (emphasis added) (attached hereto as Ex. I).
[11]   ATSDR – CERCLA, Priority List of Hazardous Substances, (2007), *available at* http://www.atsdr.cdc.gov/cercla/07list.html) (attached hereto as Ex. J).
[12]     OSHA, Hydrogen Sulfide Fact Sheet, (2005), *available at* http://www.osha.gov/OshDoc/data_Hurricane_Facts/hydrogen_sulfide_fact.pdf) (emphasis added) (attached hereto as Ex. K).
[13]     OSHA, Table Z-1 Limits for Air Contaminants, (2006), *available at* http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=9992) (emphasis added) (attached hereto as Ex. L).

3. **The Release of Harmful Sulfide Gases From Drywall Constitutes the "Discharge, Dispersal, Seepage, Migration, Release or Escape" of "Pollutants"**

The Total Pollution Exclusions preclude coverage for damages arising out of the "discharge, dispersal, seepage, migration, release or escape" of pollutants from defective drywall. (Complaint at Ex. D at p. 42; Complaint at Ex. E at p. 47; Complaint at Ex. F at p. 48; Complaint at Ex. G at p. 16; Complaint at Ex. H at p. 28; Complaint at Ex. I at p. 27). The pollution alleged in the Drywall Claims arose out of such a "discharge, dispersal, seepage, migration, release or escape" so as to preclude coverage. Specifically, the basis for the claims in *Wiltz*, *Payton*, and *Gross* is that the drywall at issue "break[s] down *and release[s] sulfides and other noxious gases that are then emitted (or 'off-gassed')*," thereby causing damage to property and personal injuries. (Complaint at Ex. C at ¶ 779; Ex. A at ¶ 2611; Ex. B at ¶ 1424) (emphasis added). Additionally, *Wiltz, Payton* and *Gross* all allege causes of action for "negligent *discharge* of a corrosive substance." (Complaint at Ex. C at Count XII; Ex. A at Count XII; Ex. B at Count XII) (emphasis added). Similarly, the basis for the claims in *KB Home* is that the drywall at issue is "*emitting gases* that are negatively interacting with other elements where installed," thereby causing damage to property and personal injuries. (Complaint at Ex. B at ¶¶ 9, 12). Similarly, the basis for the Pre-Suit Claims is that the homes at issue are "being affected by unusual *releases of sulfide gases* from the wallboard supplied by ABM." (Ex. C) (emphasis added).

Courts have found that similar emissions, releases, and "off-gassing" of harmful substances fall within the scope of language excluding coverage for discharges, dispersals, seepages, migration, releases or escapes of pollutants. For instance, the *General Fidelity*

21

court held that the off-gassing alleged in the Chinese drywall claims constituted a "release" or "escape" of pollutants. *Gen. Fid.,* (Ex. D at p. 7, n.5). In reaching this conclusion, the *General Fidelity* court was not persuaded by the fact that the underlying plaintiff amended her complaint "to eliminate any reference to 'sulfide gas' or 'chemicals being released' from the defective drywall." *Id.*

Prior to *General Fidelity*, in *Auto-Owners Insurance Co. v. City of Tampa Housing Authority*, the United States District Court for the Middle District of Florida rejected the insured's argument that lead paint flaking off the walls of a housing development over time did not constitute a "discharge, dispersal, seepage, migration, release or escape" of pollutants. 121 F. Supp. 2d 1365, 1366, *aff'd* 231 F.3d 1298 (11th Cir. 2000). Specifically, the insured in *Auto-Owners* argued that the pollutant did not cause injury through any of the six methods listed in the exclusion, and thus the exclusion did not apply. *Id.* The court found that the "movement" of the pollutant "by way of emanating from the passage of time from the walls" brought the claims within the exclusion's bar for "discharge, dispersal, seepage, migration, release or escape," and it applied the exclusion to bar coverage for the claim. *Id.* at 1368. As in *Auto-Owners*, the Drywall Claims allege that the pollutants at issue caused damage "by way of emanating from the passage of time from the walls" of the affected homes. *Id.*

In *Travco*, *supra*, the insured argued that there had been no discharge or dispersal of pollutants because there were no facts suggesting any movement by the actual defective drywall itself. *Travco*, 715 F. Supp. 2d at 718. The court found that the movement of the drywall itself was not at issue, rather, that "it is obvious that the relevant dispersal or

22

discharge in this case is the discharge and dispersal of sulfuric gas from the [d]rywall." *Id.* The court stated that "[i]t is an undisputed fact that the Chinese Drywall in Defendant's home has 'off-gassed,' dispersing and discharging sulfuric gases into the [r]esidence." *Id.*

In the instant case, the Drywall Claims involve the off-gassing of noxious and hazardous sulfide and other gases into the interior atmosphere of certain homes.  It is irrelevant that no facts suggest any movement by the actual defective drywall itself.  Rather, as in *General Fidelity*, *Travco*, and *Auto-Owners*, a "discharge, dispersal, seepage, migration, release or escape" of pollutants occurs when an allegedly harmful substance is emitted, emanates from, or is off-gassed into the air from the walls of an interior space.  Thus, the Drywall Claims arise out of and are caused by the "discharge, dispersal, seepage, migration, release or escape" of pollutants, and are thereby wholly excluded under the Policies' Total Pollution Exclusions.

## IV.    CONCLUSION

The undisputed facts establish that Granite State and NHIC have no duty to defend or indemnify the Defendants in connection with the Drywall Claims.  The unambiguous terms of the Policies' Total Pollution Exclusions, when compared to the allegations in the Drywall Claims, establish that there is no potential for coverage for the Drywall Claims, which are caused by the release of pollutants from allegedly defective Chinese drywall distributed by ABM and incorporated into buildings by KB Home.  Granite State and NHIC are therefore entitled to summary judgment.

WHEREFORE, for the reasons stated in this Motion, Plaintiffs Granite State and NHIC request this Court enter an Order and grant the following relief:

A.      A judgment in favor of Granite State declaring that Granite State has no duty under the Policies to defend or indemnify Defendants with respect to any claims or damages arising from the Drywall Claims;

B.      A judgment in favor of NHIC declaring that NHIC has no duty under the Policies to defend or indemnify Defendants with respect to any claims or damages arising from the Drywall Claims;

C.      Such other relief as the Court may deem just and proper.

Plaintiffs Granite State and NHIC hereby request oral argument on their Motion for Summary Judgment, which the Plaintiffs estimate will take one (1) hour.

Respectfully submitted,

_____
Cindy L. Ebenfeld, Esq.
HICKS, PORTER, EBENFELD & STEIN, P.A.
11011 Sheridan Street, Suite 104
Cooper City, Florida 33026
Tel:  (954) 624-8700
Fax:  (954) 624-8064

Joseph A. Hinkhouse, Esq.
Frank Valenti, Esq.
HINKHOUSE WILLIAMS WALSH LLP
180 N. Stetson Avenue, Suite 3400
Chicago, Illinois 60601
Tel:  (312) 784-5400
Fax:  (312) 784-5499
*Counsel for Plaintiffs*