UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GRANITE STATE INSURANCE COMPANY,
and NEW HAMPSHIRE INSURANCE
COMPANY,

        Plaintiffs,

v.                                         Case No.: 8:10-cv-1542-T-24-EAJ

AMERICAN BUILDING MATERIALS, INC.,
KB HOME TAMPA, LLC, and
KB HOME, INC.,

        Defendants.
_____/

## **O R D E R**

This cause comes before the Court on the parties' cross motions for summary judgment. (Dkts. 57, 59, 60, 61, 66, 68, 69, 70, 72, 79.) This is an action to determine whether Plaintiffs Granite State Insurance Company ("Granite State") and New Hampshire Insurance Company ("NHIC") (collectively, "the Insurer") have a duty to defend or indemnify its named insured, Defendant American Building Materials, Inc. ("ABM"), in lawsuits and pre-suit claims in which it is alleged that ABM supplied defective drywall imported from China to Defendant KB Home, Tampa, LLC, and KB Home, Inc., (collectively, "KB Home"), and that KB Home constructed homes using this drywall. The Chinese drywall is alleged to have caused damage to real and personal property and, in some cases, caused physical injuries to persons.

The Insurer moves for entry of a declaratory judgment that it does not owe a duty to defend or indemnify ABM, or KB Home, as an additional insured, under the applicable policies

with respect to any Chinese drywall claim.[1] Conversely, KB Home moves for entry of a declaratory judgment on its counterclaims that the Insurer has a duty to defend ABM in an underlying state court action brought by KB Home against ABM.[2]

I.     **Background and Facts**

The following facts are undisputed:

A.     **The Policies**

Granite State issued three Commercial General Liability Policies to ABM, copies of which are attached to the complaint as exhibits (collectively, the "Granite State policies" or "primary policies"). Policy number 02-LX-009273143-0/000 was effective June 15, 2007 to June 15, 2008. Policy number 02-LX-009273143-1/000 was effective June 15, 2008 to June 15, 2009. Policy number 02-LX-009273143-2/000 was effective June 15, 2009 to June 15, 2010.

NHIC issued three umbrella policies to ABM, copies of which are also attached to the complaint as exhibits (collectively, the "NHIC policies" or "umbrella policies"). Policy number 01-UD-000338726-0/000 was effective June 15, 2007 to June 15, 2008. Policy number 01-UD-000338726-1/000 was effective June 15, 2008 to June 15, 2009. Policy number 01-UD-000338726-2/000 was effective June 15, 2009 to June 15, 2010. It is undisputed that Defendants KB Home Tampa, LLC, and KB Home, Inc., are additional insureds under the primary and umbrella policies.

---

[1] ABM joined KB Home's response in opposition to the Insurer's motion for summary judgment. (Dkt. 68.)

[2] In its motion, KB Home concedes that disputed issues of material fact exist with regard to coverage for the multiple class actions filed against it in multi-district litigation pending in the Eastern District of Louisiana, and therefore, is seeking a declaration of a duty to defend only as to the underlying Florida state court action. (Dkt. 59, p.2-3.)

Granite State and NHIC employed Virtual MGU Insurance ("VMGU") to act as managing general underwriter for the Granite State policies and the NHIC policies. VMGU had the authority to underwrite contracts of insurance, enter into contracts of insurance, and bind insurance coverage on behalf of Granite State and NHIC. VMGU is located in Massachusetts.

For each of the four policies covering the two annual periods from June 15, 2007 to June 15, 2009, ABM's broker, or agent, was the Insurance Office of America ("IOA"), located in Jupiter, Florida. For each of the two policies covering the annual period of June 15, 2009 to June 15, 2010, ABM's broker, or agent, was Lassiter Ware Insurance Agency ("Lassiter Ware"), located in Tampa, Florida.

### B.     The Chinese Drywall Claims

KB Home contracted with ABM as a subcontractor to provide building materials to be used in the construction of homes in Florida. ABM supplied Chinese drywall to KB Home that was installed in numerous homes in Florida. Homeowners of certain of those homes claimed to have suffered property damages (and in some cases, physical injuries) arising out of the defective drywall.

On January 25, 2010, KB Home filed a lawsuit against ABM, seeking to recover damages suffered by KB Home arising out of the defective Chinese drywall supplied by ABM. That case is styled *KB Home Tampa, LLC v. American Building Materials, Inc.*, Case No. 10-CA-1432, and it is pending in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida.

KB Home and ABM have also been identified as defendants in several class actions pending in multi-district litigation in the Eastern District of Louisiana. These actions include

claims on behalf of homeowners against ABM and KB Home on the grounds that ABM supplied defective drywall in the homes constructed by KB Home.

KB Home and ABM have also notified Granite State and NHIC of several potential claims arising out of defective Chinese drywall. These pre-suit claims allege that certain homes built by KB Home have suffered property damage due to defective Chinese drywall supplied by ABM.

### C. The Present Lawsuit

On July 13, 2010, Granite State and NHIC brought the present lawsuit against KB Home and ABM. (Dkt. 1.) They seek a declaration that they owe no duty to defend or indemnify ABM or KB Home under the policies for any claim arising out of defective Chinese drywall supplied and installed by the defendants.

On August 19 and 25, 2010, ABM and KB Home, respectively, filed their Answers and asserted several Counterclaims against the plaintiffs. (Dkts. 9, 10.) ABM and KB Home seek a declaration that Granite State and NHIC owe a duty to defend and indemnify ABM and KB Home under the policies for any claim arising out of the defective Chinese drywall. Additionally, ABM and KB Home assert that Granite State and NHIC breached the policies by failing to respond to, investigate, and settle the claims by homeowners, and by failing to defend ABM.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court

must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1243 (11th Cir. 2001) (quotations and citation omitted).

When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Porter*, 461 F.3d at 1320. In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

III.  **Discussion**

    A.  **Choice of Law**

To resolve the parties' cross motions for summary judgment, the Court first must determine which state's law applies to the interpretation of the policies at issue, as there is no choice of law provision in the policies. This Court has obtained jurisdiction over the present case through diversity of citizenship. Therefore, it "is bound to apply the substantive law of the state in which it is located," which includes "a state's law regarding choice of laws." *Shapiro v.*

5

*Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990). Accordingly, the Court must determine which state's substantive law the Florida Supreme Court would choose to govern the interpretation of the policies, and it is "bound to decide the case the way it appears [the Florida Supreme Court] would." *Towne Realty, Inc. v. Safeco Ins. Co. of Am.*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988).

### 1. Choice of Law Rule

Here, the parties disagree not only on which state's law governs the policies, but on the analysis the Court should use in determining the applicable law. KB Home contends that Massachusetts law governs the policies because Florida courts follow the doctrine of *lex loci contractus* in determining the law that applies to an insurance policy, when that policy does not have a choice of law clause. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). Under that doctrine, in the absence of a choice of law provision in the policy, the governing law is "the law of the state in which the contract is made, i.e., where the last act necessary to complete the contract is done." *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995) (citing *Equitable Life Assurance Soc'y of the U.S.A. v. McRee*, 78 So. 22, 24 (1918)). KB Home claims that the last act necessary to form the insurance policies at issue here occurred in Massachusetts, where the Insurer's agent accepted the offer from ABM to bind coverage, where the binders for each policy were issued, and where the policies themselves were executed and issued.

The Insurer, on the other hand, contends that Florida law governs the policies because Florida courts follow the approach advanced by the Restatement (Second) of Conflict of Laws, also known as the "significant relationships" test. Under that test, the policy is governed by the

law of the state "which the parties understood was to be the principal location of the insured risk during the term of the policy," unless "some other state has a more significant relationship" to the insured risk. *Shapiro*, 899 F.2d at 1119 (quoting Restatement (Second) of Conflicts of Laws, § 193). The Insurer contends that, under this test, Florida is the only state with a significant relationship to the insured risk because the policies were issued to ABM, which is a Florida corporation, and because the Chinese drywall was supplied and installed in homes located in Florida. Alternatively, the Insurer argues that, even if the Court applies the doctrine of *lex loci contractus*, Florida law would still govern the policies because the binders for all of the policies were received by ABM and its brokers in Florida, and thus, "the last act necessary to complete the contract" occurred here.

After a thorough review of the pertinent Florida Supreme Court decisions, and federal court decisions interpreting Florida law, the Court is convinced that the Florida Supreme Court would apply a *lex loci contractus* analysis to resolve the choice of law issue. Despite an early prediction by the Eleventh Circuit over two decades ago that Florida courts would apply the Restatement test,[3] the matter has since been settled unequivocally by the Florida Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Roach*, 945 So. 2d 1160 (Fla. 2006), and the cases following.[4] In *Roach*, the Florida Supreme Court stated the following regarding the proper

---

[3]*See Shapiro*, 899 F.2d at 1121 (stating that "we hypothesize that the Florida Supreme Court would apply" the Restatement test).

[4]*Rando v. Gov't Employees Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009) (stating that "[w]ith regard to insurance contracts, Florida follows the '*lex loci contractus*' choice-of-law rule") (citing *Roach*); *CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317, 1320 (M.D. Fla. 2007) (same); *Nat'l Union Fire Ins. Co. v. Beta Constr. LLC*, No. 8:10-cv-1541, 2011 U.S. Dist. LEXIS 103393, at *9 (M.D. Fla. Sept. 13, 2011) (same); *American Home Ass. Co. v. Peninsula II Developers, Inc.*, No. 09-cv-23691, 2010 U.S. Dist. LEXIS 113588, at *21

choice of law analysis for insurance contracts:

> [I]n determining which state's law applies to contracts, we have long adhered to the rule of *lex loci contractus*. That rule, as applied to insurance contracts, provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage. In *Sturiano* [*v. Brooks,* 523 So. 2d 1126 (Fla. 1988)], we considered–and rejected– the significant relationships test. . . . We have *never* retreated from our adherence to [*the lex loci contractus*] rule in determining which state's law applies in interpreting contracts.

*Id.* at 1163-64 (citations omitted) (emphasis added). In *Roach*, the Florida Supreme Court acknowledged that *lex loci contractus* is "an inflexible rule," but explained that it is intended "to ensure stability in contract arrangements." *Id.* at 1164.

### 2.      **Application of *Lex Loci Contractus***

Under the *lex loci contractus* doctrine, in the absence of a choice of law provision in the policy, the governing law is "the law of the state in which the contract is made, i.e., where the last act necessary to complete the contract is done." *Fioretti*, 53 F.3d at 1235. Determining where the "last act necessary to complete the contract" occurred is "fact-intensive." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092-93 (11th Cir. 2004). "The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." *Id.* at 1093 (citing *Buell v. State*, 704 So. 2d 552, 555 (Fla. Dist. Ct. App. 1997)).

Applying the *lex loci contractus* doctrine to the facts of this case, the Court concludes that the last act necessary to form the policies at issue here occurred in Massachusetts, and thus, that state's law governs the interpretation of the policies. The evidence concerning the transactions between the parties and their agents that led to the formation of the policies is

---

(Oct. 19, 2010) (same); *Valiant Ins. Co. v. Progressive Plumbing, Inc.*, No. 5:06-cv-410, 2007 U.S. Dist. LEXIS 75100, at *7-8 (M.D. Fla. Oct. 9, 2007) (same).

undisputed. That evidence shows that the formation of the primary and umbrella policies for all three years in question followed the same pattern.

In each year, the agents for ABM, IOA and Lassiter Ware (who are both located in Florida), received a quote for the policies from the managing general underwriter for the Insurer, VMGU (who is located in Massachusetts).[5] Next, ABM's agent emailed VMGU an *offer* to purchase the insurance at the prices quoted, by requesting that coverage be bound.[6] VMGU then *accepted* that offer on behalf of the Insurer and issued a binder for the coverage from its offices in Massachusetts.[7] Each year, after issuing the binder from its offices in Massachusetts, VMGU itself completed the information on the declarations pages of the policies, generated the policies, and emailed electronic versions of the policies to ABM's agents in Florida.[8]

The undisputed evidence establishes that the Insurer's legal obligation to provide coverage under the policies commenced upon the issuance of the binders.[9] Thus, under the facts

---

[5] Dkt. 61, Dep. Debra Kobelenz, Ex. 3 (containing quote letter).

[6] IOA account manager, Sheri Thornton, emailed Kerry Lewis, a senior underwriter at VMGU, requesting, "Can you please go ahead and bind coverage 6/15/07 per your quote for the umbrella, auto and general liability? Please confirm back to me." Dkt. 61, Dep. Debra Kobelez, Ex. 4.

[7] Dkt. 61, Dep. Debra Kobelenz, Ex. 5 (containing transmittal letter for the binder and the binder itself, from VMGU in Massachusetts to IOA in Florida).

[8] Dkt. 61, Dep. Debra Kobelenz, Ex. 6 (containing email from VMGU underwriter Lewis to IOA manager Thornton, transmitting electronic versions of the policies).

[9] Underwriting manager for VMGU, Debra Kobelenz, testified as follows:

Q.: Is it the effect of this insurance binder to provide–to bind Granite State Insurance Company as of the effective date on this binder, 6/15, 2007 at 12:01, to that commercial general liability coverage that's referenced on the face of the form?
. . .

of this case, the issuance of the binder equates to the acceptance of the contract. The binder (and later, the policies) were generated, issued, and sent from VMGU in Massachusetts. Thus, Massachusetts is where the last act necessary to form the policies occurred.

The Court rejects the Insurer's contention that the last act occurred upon *receipt* of the binders and policies by ABM's agents in Florida, rather than the issuance of the same by VMGU in Massachusetts. That argument conflicts with the firmly established contract principle that a written contract acceptance is effective at the time it is dispatched–not when it is received by the offeror. *Morrison v. Thoelke*, 155 So. 2d 889, 897-98 (Fla. 2d DCA 1963) (stating that "[t]he rule that a contract is complete upon deposit of the acceptance in the mails," which is also known as the "deposited acceptance rule," has been applied since 1818); *see also Kendel v. Pontious*, 261 So. 2d 167, 169 (Fla. 1972) (stating that acceptance "is operative and completes the contract as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror") (quoting Restatement of Contracts, § 64); *J. Lynn Constr., Inc. v. The Fairways at Boca*

---

| | | |
|---|---|---|
| A.: | | I would say– . . . yes. |
| | | . . . |
| Q. | | Okay. So based on your 33 years of experience in the insurance industry, is it your understanding, then, that the binder effectively binds the insurance companies that are referenced on it to those coverages that are described on it as of the effective date that is reflected on the policy? |
| A.: | | Yes. |
| | | . . . |
| Q.: | | Does this form indicate to you that this insurance binder was generated by Kerry Lewis from the Virtual MGU offices in Waltham, Mass.? |
| A.: | | She could have been working from her home when she did this. She might not have been in the office. |
| | | . . . |
| Q.: | | Okay. Do you know where she lives? |
| A.: | | In Woburn, Mass. |

*See* Dkt. 61, Dep. Debra Kobelenz, p. 28, 30.

*Golf & Tennis Condo. Assoc., Inc.*, 962 So. 2d 928, 930 n.1 (Fla. 4th DCA 2007) (stating, "The deposited acceptance rule remains the law in Florida. A contract is complete upon deposit of the acceptance in the mail.").

Furthermore, the cases cited by the Insurer do not support its contention that receipt of the binders by ABM's agent in Florida was the last act necessary to complete the contract. The Insurer contends that *Prime Insurance Syndicate, Inc. v. B.J. Handley Trucking,* 363 F.3d 1089, 1092-93 (11th Cir. 2004), supports its position because there the Eleventh Circuit found that *lex loci contractus* required that Alabama law be applied because the insured's acceptance of the oral binder in Alabama was the last act necessary to execute the contract. The Insurer's reliance on *B.J. Handley Trucking* is misplaced because, in that case, the acceptance was manifested orally. *Id.* Therefore, the "deposited acceptance rule" that controls the instant case is not applicable to the oral acceptance in *B.J. Handley Trucking*. *See Thoelke*, 155 So. 2d at 902 (stating that when contracting parties are together when acceptance is communicated, acceptance is effective "upon expressions of assent instantaneously communicated"). Furthermore, the court in *B.J. Handley Trucking* does not discuss where the insurer's agent was physically located when the oral binder was communicated, and thus, there is no basis to suggest that the court selected Alabama over any other state. The facts in *B.J. Handley Trucking* are simply not developed sufficiently to support the Insurer's position here.

*CNL Hotels & Resorts, Inc. v. Houston Casualty Co.*, 505 F. Supp. 2d 1317 (M.D. Fla. 2007), also does not support the Insurer's contention that the insured's receipt of the binder is what constitutes the final act necessary to form the contract. In *CNL*, the insured argued that Florida law applied, while the insurer argued that New York law applied. *Id.* at 1320. In

applying the *lex loci contractus* doctrine, the court found that the following facts were not relevant: 1) that the policy was delivered to the insured in Florida; 2) that the insured's principal place of business was in Florida; 3) that the insurer was licensed in Florida; 4) that the policy contained riders specific to Florida; and 5) that taxes were paid on the premiums in Florida. *Id.* The district court specifically rejected the insurer's argument that Florida law should apply because the policy was issued to a Florida company in Florida. *Id.* at 1321.

Instead, the facts that the court did find relevant were the following: 1) that coverage took effect when an authorized agent issued a binder; 2) that the binder was issued from the agent's office in New York; and, 3) that the policy was signed in New York and delivered to the insured's agent in New York. *Id.* The court ultimately determined that New York law applied because both the issuance and delivery of the binder and the policy occurred in New York, not Florida. *Id.* In reaching this conclusion, the court noted, that "the important factor is the place of execution of the contract, not the place or places to which it was (eventually) mailed." *Id*. at 1320-21. Thus, *CNL* actually supports KB Home's contention that Massachusetts law governs the interpretation of the policies here.

The Insurer also relies upon *Industrial Chemical & Fiberglass Corp. v. North River Insurance Co.*, 908 F.3d 825 (11th Cir. 1990). However, the entire *lex loci* analysis in that case is contained within a single footnote. While the court states that the "last act necessary" was the insured's receipt and acceptance of the insurance policies, the case does not reveal whether the policies were delivered by mail or in person, the location of the insurer or its agent when the policies were delivered, any other facts which would support the context of acceptance, or whether the parties in the case contested or stipulated to the application of New York law. *Id.* at

829, n.3.  Similarly, *Block v. Berkshire Insurance Co.*, 585 So. 2d 1137 (Fla. 3d DCA 1991), provides no factual analysis regarding the *lex loci* determination, other than the place of delivery of the policy.  *Id.* at 1137.  Finally, the Insurer's reliance on *American Home Assurance Co. v. Peninsula II Developers, Inc.*, No. 09-cv-23691, 2010 U.S. Dist. LEXIS 113588 (Oct. 19, 2010), is also misplaced because, in that case, *neither* party claimed that the law of the state from which the binders were sent should be applied, and thus, that specific determination "was not before the Court."  *Id.* at *32.  Given that the *lex loci* determination is factually intensive and dependent upon particular factual circumstances, these cases provide little guidance to this Court

In summary, the Court concludes that the undisputed record demonstrates that the final act necessary to form the insurance contract occurred when, from its office in Massachusetts, VMGU accepted the offer from ABM's agent to purchase insurance by issuing the binder.  Thus, Massachusetts law governs the interpretation of the policies.

### B.     Duty to Defend and Indemnify

Having concluded that Massachusetts law governs the interpretation of the policies at issue here, the Court now turns to the issue of whether the Insurer has a duty to defend or to indemnify ABM or KB Home under those policies for the Chinese drywall claims.  Under Massachusetts law, "if the allegations of the [underlying] complaint are reasonably susceptible of an interpretation that they state . . . a claim covered by the policy terms, the insurer must undertake a defense."  *Continental Cas. Co. v. Gilbane Bldg. Co.*, 461 N.E.2d 209, 212 (Mass. 1984) (citations omitted).  "[W]hen the scope of coverage provided by a clause is unclear, the policy should be read so as to provide coverage to the insured."  *SCA Servs. v. Transp. Ins. Co.*, 646 N.E.2d 394, 397 (Mass. 1995).  "Any ambiguity in the policy will be construed against the

insurer." *Id.*

Here, the primary dispute among the parties is whether the total pollution exclusion contained within the policies precludes coverage. Under Massachusetts law, the Insurer has the burden of proving the applicability of any exclusion. *Great Southwest Fire Ins. Co. v. Hercules Bldg. & Wrecking Co.*, 619 N.E.2d 353, 356 (Mass. App. Ct. 1993) (citing *Ratner v. Canadian Universal Ins. Co.*, 269 N.E.2d 227, 230 (Mass. 1971)). "[A]n exclusionary clause . . . must be given its usual and ordinary meaning." *Hakim v. Mass. Ins. Insurers' Insolvency Fund*, 675 N.E.2d 1161, 1165 (Mass. 1997). Where there is more than one rational interpretation of policy language, the insured is entitled to a construction that favors coverage. *Id.* Furthermore, Massachusetts courts consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* (citing *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 616 N.E.2d 68, 72 (Mass. 1993)).

Here, the total pollution exclusion contained within the policies at issue provides: "This insurance does not apply to: . . . 'Bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Dkt. 1, Ex. D, p. 43.) "Pollutants" are defined in the policies to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Dkt. 1, Ex. D, p. 29.) Massachusetts courts interpreting pollution exclusion provisions that are similar to the one at issue here have found that such provisions are "clear, unambiguous, and enforceable." *United Techs. Corp. v. Liberty Mut. Ins. Co.*, No. 87-7172, 1993 Mass. Super. LEXIS 281, at *36 (Mass. Aug. 3, 1993); *see also Feinberg v. Commercial Union Ins. Co.*, 766 N.E.2d 888, 892 (Mass.

App. Ct. 2002) (ruling that a similar pollution exclusion was "notably unambiguous").

Under Massachusetts law, courts interpreting pollution exclusions examine whether an "objectively reasonable insured" would expect the damage caused by the pollutant at issue to be excluded under the provision. *U.S. Liab. Ins. Co. v. Bourbeau*, 49 F.3d 786, 788 (1st Cir. 1995) (citing *Hazen Paper Co. v. U.S. Fidelity & Guar. Co.*, 555 N.E.2d 576, 583 (Mass. 1990) (stating that in construing an insurance policy, Massachusetts courts "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered"). Thus, this Court must ask whether an objectively reasonable insured would have expected that the damage caused by defective Chinese drywall would have been covered under the policies at issue. It appears that no Massachusetts court, or federal court applying Massachusetts law, has answered this particular question.

This Court, however, is guided by a case decided under Massachusetts law in which the U.S. Court of Appeals for the First Circuit interpreted a pollution exclusion, with language nearly identical to the one at issue here, to preclude coverage for claims arising out of the dispersal of a similar pollutant, lead paint chips. In *Bourbeau*, the court found that the pollution exclusion was "clear and unambiguous," was "an absolute bar to coverage for 'any form of pollution,'" and "applied to *all* releases of pollutants." 49 F.3d at 788 (emphasis in original). Because the pollution exclusion barred coverage for property damage arising out of the "discharge, dispersal, release or escape of pollutants into or upon land," and because the property damage was alleged to have been caused by the "discharge, dispersal, release or escape of lead paint chips into or upon land," the only remaining question for the court to decide was "whether lead paint chips . . . constitute[d] 'pollutants.'" *Id.*

The court answered that question in the affirmative. *Id.* The court noted that, under the policy, "pollutants" were defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, toxic chemicals or materials and waste." *Id.* The court reasoned, "we do not see how an objectively reasonable insured would expect to be covered for contamination of property caused by the removal and discharge of lead paint chips." *Id.* Stated another way, the court reasoned, "[w]e fail to see how an objectively reasonable insured could possibly believe that 'smoke, vapor, soot [and] fumes' would be considered pollutants while lead paint would not." *Id.* at 788-89.

Following the same analysis here, the Court concludes that an objectively reasonable insured would not have expected that damage caused by defective Chinese drywall would be covered under the policies. The pollution exclusion bars damage caused by the "discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." In the underlying claims, it is alleged that the defective Chinese drywall "is emitting gases that are negatively interacting with other elements . . . , causing damage to the Subject Homes and other property." (Dkt. 1, Ex. B, ¶ 12.) It is further alleged that the "[e]xposure to sulfide and other noxious gases, such as those emitted from [the Chinese] drywall, causes personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm." (Dkt. 1, Ex. C, ¶ 781.) In the policies, "pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

The basis of the underlying claims is that the Chinese drywall is defective because it is emitting harmful gases that are causing damage to real and personal property, and personal

16

injury. The total pollution exclusion unambiguously precludes coverage for the release or discharge of pollutants. Pollutants include any gaseous contaminant. Thus, the Court concludes that an objectively reasonable insured would not have expected that damage caused by the defective Chinese drywall, which allegedly emitted harmful gases and caused damage to property and persons, would have been covered under the policies.

This result is consistent with other Massachusetts cases in which courts have considered whether the objectively reasonable insured would have expected damage caused by other pollutants to be covered. For example, in *Western Alliance Insurance Company v. Gill*, 686 N.E.2d 997, 999-1002 (Mass. 1997), the Massachusetts Supreme Court held that the pollution exclusion did not exclude coverage for damages to a restaurant patron arising from carbon monoxide fumes from a restaurant oven. The court held that an objectively reasonable insured would not have expected the policy to cover "mishaps" in their ordinary cooking operations. *Id.* at 1000.

In reaching this conclusion, however, the court emphasized that "the exclusion has to be interpreted and applied in a commonsense manner with due attention to the circumstances of the accident giving rise to a coverage claim." *Id.* at 999. The court acknowledged that "a reasonable policy holder might well understand carbon monoxide *is* a pollutant when it is emitted in an industrial or environmental setting." *Id.* at 1000 (citations omitted) (emphasis added). Thus, the court distinguished cases that "involve injuries resulting from everyday activities gone slightly . . . awry," in which the pollution exclusion would not apply, from industrial or environmental pollution cases, or cases that involve the discharge of a harmful substance onto land, in which the exclusion would apply. *Id.*

The distinction drawn in *Gill* is critical to the Court's decision here.  The Court has taken into account the circumstances of the damage caused by defective Chinese drywall, particularly the fact that the damage is alleged to have been caused by harmful gases emitted from the drywall, and not a "mishap" in everyday activities.  Thus, it is clear that the pollution alleged here is the industrial or environmental type of which the Massachusetts Supreme Court would find to be excluded under the policies.

Likewise, the Court's decision is consistent with *Atlantic Mutual Insurance Co. v. McFadden*, 595 N.E.2d 762 (Mass. 1992), another case in which the Massachusetts Supreme Court drew a distinction between industrial or environmental pollution, and "mishaps" or "accidents."  In *McFadden*, the court held that the pollution exclusion did not apply to damages caused by the *presence* of lead paint in a private residence.  *Id.*  The court ruled that an objectively reasonable insured would understand the exclusion to cover "certain forms of industrial pollution, but not . . . the presence of leaded materials in a private residence." *Id.* at 764.  Again, the instant case concerns damage caused by the *emission of harmful gases*, which is more like a form of industrial pollution.

In summary, the Court concludes that the total pollution exclusion contained in the policies at issue here are unambiguous, and that an objectively reasonable insured would not have expected that the damage caused by defective Chinese drywall would have been covered under the policies.  Therefore, the Insurer does not owe a duty to defend or indemnify the defendants under the policies for claims of defective Chinese drywall.

**IV.    Conclusion**

For the reasons stated herein, the Court concludes that the total pollution exclusion

contained within the primary and umbrella policies at issue here exclude coverage for the Chinese drywall claims asserted against ABM and KB Home. Therefore, the Insurer does not owe a duty under the policies to defend or indemnify ABM or KB Home. Accordingly, KB Home's Motion for Summary Judgment (Dkt. 59) is **DENIED**, and the Insurer's Motion for Summary Judgment (Dkt. 57) is **GRANTED**. The Clerk is directed to enter judgment in favor of Granite State Insurance Company and New Hampshire Insurance Company, and against American Building Materials, Inc., KB Home Tampa, LLC, and KB Home, Inc., and to close this case. The pretrial conference scheduled in this case for December 8, 2011 is hereby **CANCELLED**, and this case is removed from the Court's January 2012 trial calendar.

**DONE AND ORDERED** at Tampa, Florida, this 5th day of December, 2011.

Susan C. Bucklew
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record